# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

R.J. ZAYED, in his Capacity as Court-
Appointed Receiver for Trevor G. Cook,
et al.,

               Plaintiff,

v.

ARCH INSURANCE COMPANY,

               Defendant.

Case No. 11-CV-1319 (PJS/TNL)

ORDER

Katie C. Pfeifer and Kieran P. Cofell-Dwyer, DORSEY & WHITNEY LLP, for
plaintiff.

Paul T. Curley, Joan M. Gilbride, and Patrick Stoltz, KAUFMAN BORGEEST & RYAN
LLP; M. Gregory Simpson and Joel T. Wiegert, MEAGHER & GEER, PLLP, for
defendant.

Trevor Cook operated one of the largest Ponzi schemes in the history of Minnesota.  In

August 2009, just a few months before the government shut down Cook and his fraudulent

enterprise, Cook filed a state-court action against Lynn Edward Baker and several entities

affiliated with Baker, including Mesa Holdings, Inc. ("Mesa").  In that lawsuit, Cook essentially

alleged that *he* had been defrauded by *Baker*.  After the government shut down Cook, plaintiff

R.J. Zayed was appointed as receiver for Cook's estate.  In that capacity, Zayed pursued Cook's

lawsuit against Mesa and Baker, hoping to recover money that could be used to compensate

Cook's victims.  The parties eventually reached a *Miller-Shugart* settlement, and, pursuant to

that settlement, a $1 million judgment was entered against Mesa and a $500,000 judgment was

entered against Baker.

At the time that Cook sued Mesa and Baker, they were insured by defendant Arch Insurance Company ("Arch"). Arch, however, denied responsibility for defending or indemnifying Mesa or Baker in connection with Cook's lawsuit. As part of the *Miller-Shugart* settlement, Mesa and Baker assigned to Zayed any claims that they had against Arch for breach of its duties to defend and indemnify. Zayed then filed this action against Arch. Standing in the shoes of Mesa and Baker, Zayed seeks to force Arch to indemnify Mesa and Baker for the $1.5 million in judgments that were entered against them and to force Arch to pay the roughly $70,000 in attorney's fees and costs that they incurred in defending Cook's lawsuit.

Zayed and Arch have filed cross-motions for summary judgment. For the reasons that follow, the Court holds that Arch had no duty to indemnify Mesa or Baker. The Court makes no determination regarding Arch's alleged breach of its duty to defend, however, because that issue was not fully briefed by the parties.

## I. BACKGROUND

Baker wore many hats. Baker owned 100 percent of Baker Capital LLC ("Baker Capital"). *See* Gilbride Decl. Ex. 2 ¶ 7 [ECF No. 35-1 at 13] ("Second Baker Decl."). Baker Capital, in turn, owned 33 percent of Mesa, and Baker personally owned another 1 percent of Mesa. *See* Def. Mem. in Supp. at 3 [ECF No. 34] ("Def. Mem.").[1] Baker was also an officer and director of Mesa. *See* Gilbride Decl. Ex. 1 ¶ 3 [ECF No. 35-1 at 3] ("First Baker Decl.").

---

[1]The Second Baker Declaration states that Baker Capital owned 35 percent of Mesa. *See* Second Baker Decl. ¶ 2. The total ownership figures provided in that declaration must be in error, however, as they add up to 102 percent. *Id*. Arch's memorandum in support of its motion for summary judgment states that Baker Capital owned 33 percent of Mesa, *see* Def. Mem. at 3, and the Court will assume that Arch is correct. The exact percentage does not matter for purposes of this order.

Mesa owned 100 percent of Mesa Financial Advisors, Inc. ("Mesa Financial"), of which Baker was likewise an officer and director. *See id.* ¶¶ 2-3.

Mesa Financial's business strategy was to purchase small registered investment advisor firms ("RIAs"), then operate and provide back-office support for those RIAs. *Id.* ¶ 3. In 2008, Mesa sought to raise funds for Mesa Financial to use in acquiring new RIAs. *Id.* ¶ 4. Mesa hired Baker Capital to raise those funds. *See* Gilbride Decl. Ex. 4 [ECF No. 35-1 at 24].

Later that year, Baker was introduced to Cook, who owned Oxford Global FX, LLC ("Oxford"). Based on discussions with Baker, Cook and Oxford decided to make a series of investments in Mesa and other Baker-related entities:

> *First*, in September 2008, Oxford invested $500,000 in Mesa, receiving a zero coupon convertible promissory note in return. *See* Dwyer Aff. Ex. 7 [ECF No. 41-2 at 3-8].
>
> *Second*, in October 2008, Oxford invested an additional $2 million in Mesa, this time receiving common stock in return. *See* Dwyer Aff. Ex. 32 [ECF No. 41-6 at 29].
>
> *Third*, during the first half of 2009, Oxford made a series of short-term loans to Mesa totaling $1.05 million.[2]
>
> *Finally*, in March 2009, Cook personally invested $200,000 in currency funds managed by Baker Capital. *See* Am. Compl. ¶ 15 [ECF No. 27-1].
>
> Neither Oxford nor Cook ever got any of their money back.

In August 2009, Cook sued Baker, Baker Capital, Mesa, Mesa Financial, and other Baker-related entities in Minnesota state court over the last of these four investments — the

---

[2]The amended complaint filed in this case and the amended complaint filed in the underlying action allege that Cook, not Oxford, made the first three investments. *See* Am. Compl. ¶ 14 [ECF No. 27-1]; Gilbride Decl. Ex. 10 ¶ 16 [ECF No. 35-3 at 4-5]. The parties agree, however, that Oxford made those investments. *See* Def. Mem. at 5-6; Pl. Mem. in Supp. at 9 n.2 [ECF No. 39].

$200,000 deposited by Cook into the currency funds managed by Baker Capital. *See* Gilbride Decl. Ex. 20 [ECF No. 35-5 at 3-12] ("First Cook Compl."). Specifically, Cook alleged that the defendants refused his requests to withdraw his money from those currency funds. *Id*. ¶¶ 12-15. Cook's complaint included claims for breach of contract, conversion, breach of fiduciary duty, and violation of the Minnesota Securities Act, Minn. Stat. § 80A.40 et seq. First Cook Compl. ¶¶ 22-36. Cook's complaint also alleged that each of the defendants was the alter ego of each of the other defendants. *Id*. ¶¶ 8-11.

Two months later, in October 2009, Cook amended his complaint. *See* Gilbride Decl. Ex. 10 [ECF No. 35-3] ("Second Cook Compl."). The amended complaint repeated the allegations made in the original complaint and added allegations that Baker had misrepresented Mesa's financial health when he solicited the investments from Oxford. *Id*. ¶¶ 11-27. Like the original complaint, the amended complaint sought the return of the $200,000 that Cook had personally invested in the currency funds. But the amended complaint also sought the return of the $3,550,000 that Oxford had invested in or loaned to Mesa, plus additional costs. *Id*. at 13-14. Finally, the amended complaint sought non-monetary relief; specifically, Cook sought the involuntary dissolution of Mesa pursuant to Minn. Stat. § 302A.751. *Id*. ¶¶ 50-61.

In 2009, Mesa carried a directors, officers, and organization liability insurance policy ("the Policy") that had been issued by Arch. Broadly speaking, the Policy required Arch to defend Mesa and Mesa's directors and officers (including Baker) against claims arising out of wrongful acts. *See generally* Dwyer Aff. Exs. 9-10 [ECF No. 41-2 at 37-75] ("D&O Policy"). The Policy also required Arch to indemnify Mesa up to $1 million for any "Loss" suffered because of such claims, *see* D&O Policy at 38; D&O Policy Liability Coverage Part

§§ 1.B & 1.C, and to indemnify Mesa's directors and officers (including Baker) up to $500,000 for any "Non-Indemnifiable Loss" suffered by those individuals, *see* D&O Policy at 38; D&O Policy Liability Coverage Part § 1.A.

Arch initially did not deny its obligation to defend Mesa and Baker against Cook's state-court action, *see* Dwyer Aff. Exs. 11-12 [ECF No. 41-3 at 1-10], and it paid a total of $9,991.90 in defense costs, *see* Dwyer Aff. Ex. 15 [ECF No. 41-3 at 57]. Arch later concluded, however, that none of Cook's claims was covered by the Policy. *See* Dwyer Aff. Ex. 16 [ECF No. 41-3 at 58-64]. Arch stopped paying defense costs, and it denied that it would be responsible for indemnifying Mesa or Baker for any loss resulting from Cook's lawsuit. *Id*. at 64.

Meanwhile, Cook had his own problems. On November 23, 2009, both the Commodity Futures Trading Commission and the Securities and Exchange Commission filed complaints against Cook, Oxford, and other entities controlled by Cook, alleging that Cook had defrauded hundreds of investors out of more than $190 million. *See U.S. Commodity Futures Trading Comm'n v. Cook*, No. 09-CV-3332 (D. Minn. filed Nov. 23, 2009); *U.S. Sec. and Exch. Comm'n v. Cook*, No. 09-CV-3333 (D. Minn. filed Nov. 23, 2009).[3] That same day, Cook's assets were frozen, and Zayed was appointed as receiver for the estates of Cook and Oxford. In that capacity, Zayed continued to pursue Cook's state-court action against Mesa and Baker, hoping to recover money that could be passed on to the victims of Cook's Ponzi scheme.

---

[3]A felony information was filed against Cook in March 2010, and he later pleaded guilty to one count of aiding and abetting mail fraud and one count of tax evasion. *See United States v. Cook*, No. 10-CR-0075 (D. Minn. filed March 30, 2010). Cook was sentenced in August 2010 to 240 months' imprisonment on the count of aiding and abetting mail fraud and 60 months' imprisonment on the count of tax evasion, with those terms to be served consecutively.

On February 16, 2011, Zayed, Mesa, and Baker[4] reached a *Miller-Shugart* settlement of the state-court action.[5] Gilbride Decl. Ex. 23 [ECF No. 35-6 at 1-21] ("Agreement"). The settlement stipulated that a reasonable jury could find Mesa and Baker liable for $2.5 million for Cook's "tort claims" arising out of Oxford's $2.5 million investment in Mesa in September and October of 2008. *Id.* ¶ 5. By "tort claims," the parties apparently meant Cook's claims for conversion, breach of fiduciary duty, and violation of Minn. Stat. §§ 80A.40 and 302A.751. *See id.* ¶ 5; *id.* at 13. Zayed agreed to settle those claims in return for entry of a $1 million judgment against Mesa and a $500,000 judgment against Baker. *Id.* ¶ 5. None of the settlement was allocated to any defendant other than Mesa and Baker, and none of the settlement was allocated to any claim against Mesa and Baker other than the tort claims seeking return of the $2.5 million investment. *Id.* In other words, none of the settlement was apportioned to Cook's claim that Mesa and Baker had breached contracts by failing to repay the $1.05 million that Oxford had loaned to Mesa and the $200,000 that Cook had invested in the currency funds. Judgment was entered in accordance with the agreement. *See* Gilbride Decl. Ex. 23 at 22-23 [ECF No. 35-6].

As part of the *Miller-Shugart* settlement, Mesa and Baker assigned to Zayed any claims that they had against Arch for breach of the duties to defend and indemnify. Agreement ¶ 3. Acting as assignee of Mesa and Baker, Zayed then filed this action against Arch. Zayed seeks to

---

[4] Baker filed for bankruptcy before the settlement was reached. John R. Stoebner, the Chapter 7 trustee for Baker's bankruptcy, was also a party to the *Miller-Shugart* settlement. *See* Gilbride Decl. Ex. 23 at 1 [ECF No. 35-6].

[5] *See Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982). Under a *Miller-Shugart* settlement, the defendant agrees that a stipulated judgment in a particular amount may be entered against it. In return, the plaintiff agrees not to collect the stipulated judgment from the defendant itself, but only from the proceeds of any available insurance coverage. The defendant essentially drops out of the litigation, and the plaintiff pursues recovery from the defendant's insurer.

force Arch to indemnify Mesa for the $1 million judgment entered against it and to indemnify

Baker for the $500,000 judgment entered against him.  Zayed further seeks to force Arch to

reimburse Mesa and Baker for about $70,000 in attorney's fees and costs that they incurred in

defending the state-court action.

Arch now moves for summary judgment, arguing, among other things, that the Policy did

not cover any of Cook's claims against Mesa and Baker, and therefore Arch was not obligated to

defend or indemnify them.  ECF No. 32.  Zayed also moves for partial summary judgment,

arguing, among other things, that the claims to which the $1.5 million *Miller-Shugart* settlement

was allocated were covered by the Policy, meaning both that Arch breached its duty to defend

Mesa and Baker, and that Arch must now indemnify Mesa and Baker for the judgments entered

against them.  ECF No. 37.

## II.  ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome

of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

This Court has jurisdiction over this coverage dispute under 28 U.S.C. § 1332 because

the parties are diverse.  "In insurance coverage actions involving diversity of citizenship, state

law controls our analysis of the insurance policy."  *Nat'l Am. Ins. Co. v. W & G, Inc.*, 439

F.3d 943, 945 (8th Cir. 2006). The parties agree that Minnesota law controls in this case. *See* Pl. Mem. in Supp. at 22 n.4 [ECF No. 39].

### A. *Arch's Duty to Indemnify Baker for "Non-Indemnifiable Loss"*

As explained above, pursuant to the *Miller-Shugart* agreement, a $1 million judgment was entered against Mesa, and a $500,000 judgment was entered against Baker. *See* Agreement ¶ 5. Perhaps not coincidentally, the Policy provides $1 million in coverage to Mesa for "Loss" and $500,000 in coverage to Baker for "Non-Indemnifiable Loss." D&O Policy at 38, 57. The parties first dispute whether the judgment against Baker represents a "Non-Indemnifiable Loss."

"Non-Indemnifiable Loss" is defined by the Policy as "any Loss incurred by Insured Persons [such as Baker] that all Insured Organizations [such as Mesa] cannot indemnify because of: (1) legal prohibition; or (2) Insolvency." D&O Policy General Provisions § 2.R. The question, then, is whether Mesa was prevented from indemnifying Baker for the $500,000 judgment by either "legal prohibition" or "Insolvency."

Zayed does not argue that Mesa was legally prohibited from indemnifying Baker. But Zayed argues that Mesa was insolvent because, at the time that the *Miller-Shugart* agreement was reached, Mesa's liabilities exceeded its assets. The problem for Zayed, though, is that the Policy does not define "Insolvency" to mean a situation in which liabilities exceed assets. Rather, the Policy defines "Insolvency" as "the status of any Insured Organization due to: (1) the appointment of any conservator, liquidator, receiver, trustee, or similar official to control, supervise, or liquidate such Insured Organization; or (2) such Insured Organization becoming a Debtor in Possession." *Id.* § 2.J. It is uncontested that Mesa had not become a "Debtor in Possession" and that no "conservator, liquidator, receiver, trustee, or similar official" had been

appointed "to control, supervise, or liquidate" Mesa. Thus, Mesa was not prevented from indemnifying Baker because of "Insolvency," as that term is defined in the Policy.

Although *Mesa* had not filed for bankruptcy before the *Miller-Shugart* settlement was reached, *Baker* had filed for bankruptcy by that point. Seizing on this fact, Zayed makes a second argument for why the $500,000 in additional coverage is available to Baker. According to Zayed, the Court should use the doctrine of "reverse piercing" to impute *Baker's* personal bankruptcy to *Mesa*. This would make Mesa "Insolven[t]" for purposes of the Policy and make the $500,000 in coverage available to Baker — or at least Zayed so argues.

As the name suggests, the reverse-piercing doctrine is related to the doctrine of piercing the corporate veil. In both situations, "the pierce is advocated so that the corporate shareholder and the corporate entity shall be considered one and the same." *Roepke v. W. Nat'l Mut. Ins. Co.*, 302 N.W.2d 350, 352 (Minn. 1981). In the traditional veil-piercing situation, a plaintiff who has been harmed by the corporation wants to pierce the corporate veil so that the plaintiff can hold a corporate insider liable for the corporation's wrongful acts. *See Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007). In the reverse-piercing situation, however, it is the *insider* who wants to pierce the corporate veil — that is, to be treated as legally indistinguishable from the corporation — so that he can benefit from insurance that covers only the corporation.

*Roepke* is the one and only case in which the Minnesota Supreme Court has sanctioned reverse piercing by a corporate insider. In *Roepke*, the plaintiff's decedent was the president and sole shareholder of a corporation. 302 N.W.2d at 351. The corporation owned and insured six vehicles. *Id.* The decedent and his family did not personally own any vehicle, but used all six of

the corporation's vehicles as family vehicles. *Id*. While driving one of those vehicles, the

decedent collided with a truck and was killed. *Id*. His family sought to recover under the

corporation's insurance policy. The Minnesota Supreme Court reverse pierced the corporate veil

and held that the decedent was insured under a policy that, on its face, covered only the

corporation. *Id*. at 352.

The *Roepke* court seemed to recognize that it was climbing out on a limb, and it took

pains to emphasize the extremely narrow scope of its holding:

> [W]e limit this holding to the facts peculiar to this case, the most
> significant of which are that decedent was the president and sole
> shareholder of the named insured corporation; the vehicles insured
> by defendant were used as family vehicles; and neither decedent
> nor members of his household owned any other vehicles.

*Id*. at 353. "In the years following *Roepke*, the Minnesota courts have made clear that *Roepke* is

an outlier that has no application beyond its precise facts." *Interstate Indem. Co. v. Ulven*,

No. 07-CV-4029, 2009 WL 2208213, at *9 (D. Minn. July 22, 2009). For example, in

*Kuennen v. Citizens Security Mutual Insurance Co.*, the plaintiff's decedent was killed in an

accident while driving his corporation's vehicle. 330 N.W.2d 886, 886 (Minn. 1983). The

decedent was the majority shareholder of the corporation, which had only one other shareholder.

*Id*. The decedent treated two of the corporation's four vehicles as personal vehicles, and the

decedent's family owned no other vehicles. *Id*. Despite the striking similarities with *Roepke*, the

Minnesota Supreme Court refused to reverse pierce. The court explained that two of the three

"significant" facts that had been present in *Roepke* were missing in *Kuennen*: the decedent was

not the corporation's sole shareholder (but only one of two shareholders), and only some (not all)

of the corporation's vehicles were used as family vehicles.  *Id*. at 887.  The court called these distinctions "crucial."  *Id*.

The facts of this case have even less in common with *Roepke* than the facts of *Kuennen*. Baker was not the sole shareholder of Mesa, but was instead 1 of 126 shareholders.  *See* Second Baker Decl. ¶ 2.  And Baker did not own all of Mesa's stock or even a majority of Mesa's stock, but instead only 34 percent of Mesa's stock (counting both the stock that Baker owned personally and the stock that he owned through Baker Capital).  Under *Kuennen*, these distinctions — in and of themselves — defeat Zayed's attempt to engage in reverse piercing.

But Zayed's attempt to engage in reverse piercing runs into a more fundamental problem: What Zayed seeks to do is not, in fact, to engage in reverse piercing.  In *Roepke* and similar reverse-piercing cases, the insider sought to be treated as legally indistinguishable from the corporation so as to enjoy insurance coverage that was available only to the corporation.  Here, however, if Baker were treated as legally indistinguishable from Mesa, he would not receive the $500,000 in coverage for "Non-Indemnifiable Loss," because that coverage is not available to Mesa, but only to officers and shareholders who cannot be indemnified by Mesa.  The whole point of the "Non-Indemnifiable Loss" coverage is to protect human beings who are *separate* from the corporation and who are not indemnified by the corporation.  In short, Zayed is not really asking the Court to apply the doctrine of reverse piercing; instead, Zayed is simply asking the Court to rewrite the terms of the Arch policy more to his liking.  This, of course, the Court cannot do.

Because Mesa was not prevented from indemnifying Baker by either Insolvency (as that term is defined in the Policy) or by legal prohibition, the $500,000 judgment entered against

Baker does not fall within the coverage for "Non-Indemnifiable Loss." Arch has no duty to indemnify Baker for the $500,000 judgment entered against him.

### B. Arch's Duty to Indemnify Mesa for "Loss"

As noted, the Policy provides not only $500,000 in coverage to Baker for "Non-Indemnifiable Loss," but also $1 million in coverage to Mesa for "Loss." Arch contends that, due to several exclusions in the Policy, Arch has no duty to indemnify Mesa. The Court will address only two of those exclusions: the contractual-liability exclusion and the exclusion for matters that are uninsurable as a matter of law.

### 1. The Contractual-Liability Exclusion

The Policy excludes coverage for "Loss for any Claim . . . arising from, based upon, or attributable to any liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement . . . ." D&O Policy Liability Coverage Part § 4.B.1 (the "contractual-liability exclusion"). Minnesota courts have previously interpreted the phrase "arising from" in insurance policies as being broader than proximate causation. *See Faber v. Roelofs*, 250 N.W.2d 817, 822 (Minn. 1977).[6] Under Minnesota law, the phrase "arising from *x*" encompasses any claim that would not exist "but for *x*." *See id*. In this case, then, the contractual-liability exclusion covers any claim that would not exist but for "liability under any contract or agreement." D&O Policy Liability Coverage Part § 4.B.1.

---

[6]*Faber* actually interprets the phrase "arising out of," not the phrase "arising from." *See* 250 N.W.2d at 819. But those two phrases are generally considered to mean the same thing. *See Spirtas Co. v. Fed. Ins. Co.*, 521 F.3d 833, 836-37 (8th Cir. 2008) (equating "arising out of" with "arising from" under Missouri law and referring to this interpretation as "the majority rule").

For example, there is little question that Cook's claim for return of the $1.05 million that Oxford loaned to Mesa would fall within this exclusion, which is presumably why the *Miller-Shugart* agreement does not allocate any of the settlement to that claim. Cook's claim for return of the $1.05 million rested on several legal theories — such as breach of contract, conversion, breach of fiduciary duty, and statutory violations — but Cook would not have had *any* claim for return of the $1.05 million if Mesa had fulfilled the loan agreement and repaid the loans as promised. Thus, Cook's claim for return of the $1.05 million, no matter how it is labeled, is a claim "arising from . . . any liability under any contract or agreement," because the claim would not exist if Mesa had not breached its loan agreement with Oxford. *See Spirtas Co. v. Fed. Ins. Co.*, 521 F.3d 833, 834-37 (8th Cir. 2008) (finding that claims of conversion and unjust enrichment arose from contractual liability and thus fell under the contractual-liability exclusion at issue); *Callas Enters., Inc. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 955-57 (8th Cir. 1999) (finding that claims of trademark infringement and defamation arose out of contractual liability).

Much the same can be said of Cook's claim for return of the $200,000 that he personally invested in the currency funds managed by Baker Capital. Again, in pursuing that claim, Cook relied on several legal theories — such as breach of contract, conversion, breach of fiduciary duty, and statutory violations — but Cook would not have had *any* claim for return of the $200,000 if Baker Capital had fulfilled its contractual obligation to permit Cook to withdraw his money from the currency funds. Thus, Cook's claim for return of the $200,000, no matter how it is labeled, is a claim "arising from . . . any liability under any contract or agreement," because the claim would not exist if Baker Capital had not breached its contract with Cook.

As noted, none of the *Miller-Shugart* settlement is allocated to the claim for return of the $1.05 million in loans or the claim for return of Cook's $200,000 investment, so the application of the contractual-liability exclusion to those claims is an academic question. But application of the contractual-liability exclusion to Cook's claim for return of the $2.5 million that Oxford invested in Mesa is far from academic, as the entire *Miller-Shugart* settlement is allocated to that claim. The parties dispute whether that claim falls within the contractual-liability exclusion.

Arch argues that it does. Arch points out that the relationship between Mesa, on the one hand, and Cook and Oxford, on the other, was entirely a creature of contract. The parties entered into multiple contracts, including the contracts under which the $2.5 million was invested in Mesa. Arch argues that but for these contracts, Mesa would not have any liability to Cook or Oxford — and thus, in Arch's view, the contractual-liability exclusion applies to Cook's claim for return of the $2.5 million.

Arch's interpretation of the contractual-liability exclusion is extremely broad. Consider the following hypothetical: Suppose that a homeowner hires a carpet cleaner to clean the carpeting in her home. Suppose further that, while the carpet cleaner is working, the homeowner backs her car out of her garage and collides with the carpet cleaner's truck, which is parked in the homeowner's driveway. The carpet cleaner would have a garden-variety tort claim against the homeowner for negligently backing her car into his truck. As Arch would have it, though, the carpet cleaner's tort claim would fall within the contractual-liability exclusion, because but for the carpet-cleaning contract, the carpet cleaner's truck would not have been parked in the homeowner's driveway.

This hypothetical illustrates the problem with Arch's interpretation. The contractual-liability exclusion applies to claims "arising from . . . any *liability* under any contract . . . ." D&O Policy Liability Coverage Part § 4.B.1 (emphasis added). Thus, the Policy does not exclude coverage for claims that would not exist but for a *contract*; instead, the Policy excludes coverage for claims that would not exist but for *contractual liability* — that is, but for a *breach* of a contract. The carpet cleaner's claim against the homeowner for negligently backing into his truck does not fall within the contractual-liability exclusion, because that claim would exist even if both parties to the carpet-cleaning contract had fulfilled all of their obligations under the contract.

Cook's claim for return of Oxford's $2.5 million investment in Mesa is similar to the carpet cleaner's claim for the damage to his truck. The essence of Cook's argument is that Baker tricked him into investing in Mesa by lying to him about Mesa's financial condition. When Mesa turned out to be worthless, Oxford's investment also turned out to be worthless. To be sure, the $2.5 million investment was the subject of contracts between Oxford and Mesa, and therefore Cook's claim against Mesa would not exist but for a contract. *See* Dwyer Aff. Ex. 8 [ECF No. 41-2 at 3-8]. But even if Mesa and Baker had fulfilled every provision of every contract, Cook could still bring a claim against Mesa and Baker for fraudulently inducing Oxford to invest in a worthless company.[7]

_____

[7]To be sure, Cook may *also* have a breach-of-contract claim with respect to the $2.5 million investment, but the point remains that, even if Mesa and Baker were *not* liable under any contract, Cook would still be able to pursue his other claims. Thus, any liability on the other claims "would have been incurred in the absence" of the contractual liability. D&O Policy Liability Coverage Part § 4.B.1.

In short, Cook's claim for the return of Oxford's $2.5 million investment in Mesa does not "aris[e] from . . . any liability under any contract or agreement," because Cook's claim would exist even if neither Mesa nor Baker had any liability under any contract. Therefore, Cook's claim does not fall within the contractual-liability exclusion.

2.  The Exclusion for "Matters that are Uninsurable under the Law"

The Policy requires Arch to indemnify Mesa for "Loss." D&O Policy Liability Coverage Part §§ 1.B & 1.C. The Policy initially defines "Loss" as "the amount that the Insureds are legally obligated to pay resulting from a Claim . . . ." *Id.* at § 2.I. But the Policy then goes on to exclude from the definition of "Loss" "matters that are uninsurable under the law pursuant to which this Policy shall be construed . . . ." *Id.* § 2.I.3. Arch argues that Cook's claim for return of Oxford's $2.5 million investment in Mesa is "uninsurable under [Minnesota] law," and thus the judgment entered against Mesa pursuant to the *Miller-Shugart* agreement (which was allocated entirely to the $2.5 million claim) is not a "Loss" for purposes of the Policy. (Of course, if Cook's claim is uninsurable as a matter of law, it does not matter whether the claim is covered under the language of the Policy, as the claim is uninsurable as a matter of law.)

Minnesota case law on the topic of insurability is murky and not terribly abundant. But a close examination of the relevant Minnesota cases reveals two principles that are helpful in determining whether Cook's $2.5 million claim against Mesa is insurable.

First, in deciding whether a claim can be insured, Minnesota courts appear to look past labels and focus instead on the substance of the claim. For example, in *Independent School District No. 697 v. St. Paul Fire & Marine Insurance Co.*, 495 N.W.2d 863 (Minn. Ct. App. 1993), a school district settled a claim of age discrimination brought by a former employee, then

looked to its insurer for indemnification. The question of whether the alleged discrimination was intentional or unintentional was important, because prior Minnesota case law had established that acts of unintentional discrimination were insurable. *See id.* at 864 n.1. To determine whether the plaintiff's claim was for intentional discrimination, the Minnesota Court of Appeals did not simply look at how the plaintiff had characterized her cause of action. Instead, the court scrutinized the "background factual record" and the relevant paragraphs of the complaint. *Id.* The court's examination made it clear that the former employee's claim was in substance a claim for intentional discrimination, and the court treated it as such.[8] *Id.*

Second, in distinguishing insurable claims from uninsurable claims, Minnesota courts have been concerned about moral hazard — that is, the risk that, if a particular type of wrongful conduct can be insured, people will engage in more of that type of wrongful conduct. Minnesota courts are more likely to find wrongdoing to be uninsurable if they believe that insurance coverage will encourage further wrongdoing. For example, in *St. Paul Fire & Marine Insurance Co. v. Briggs*, a trucking company failed to pay its federal taxes. 464 N.W.2d 535, 537 (Minn. Ct. App. 1990). After the company filed for bankruptcy, the Internal Revenue Service attempted to collect the unpaid taxes directly from the officers of the company. *Id.* at 537-38.

---

[8]*See also Wojciak v. N. Package Corp.*, 310 N.W.2d 675, 680-81 (Minn. 1981). In *Wojciak*, the Minnesota Supreme Court found that "in most instances public policy should prohibit a person from insuring himself against misconduct of a character serious enough to warrant punitive damages." *Id.* at 680. Despite that conclusion, the *Wojciak* court went on to hold that multiple-damage awards pursuant to the Minnesota Workers' Compensation Act ("WCA"), Minn. Stat. § 176.001 et seq., are insurable. The WCA refers to such multiple-damage awards as "punitive damages." Minn. Stat. § 176.82, subd. 1. But, the court said, "the [WCA] reflects as much a concern for employees' welfare as it does a desire to punish employers and deter them from the forbidden conduct." *Id.* at 680. In short, what drove the court's analysis in *Wojciak* was not the *label* attached to the statutorily created cause of action, but rather the *substance* of that cause of action.

The officers sought indemnification from their insurer.  *Id.* at 538.  *Briggs* held that such tax liabilities are uninsurable as a matter of Minnesota law, in part because of the fear that coverage would encourage insureds to foist their tax liability onto their insurers.  *See id.* at 539 ("It is a central concept of insurance that a single insured will not be allowed, through reckless or intentional acts, to control the risks covered by the policy.").

Conversely, in *Independent School District No. 697*, the Minnesota Court of Appeals found that a claim of intentional discrimination was insurable, because "'common sense suggests that the prospect of escalating insurance costs and the trauma of litigation . . . would normally neutralize any stimulative tendency the insurance might have.'"  495 N.W.2d at 867 (quoting *Sch. Dist. For City of Royal Oak v. Conti'l Cas. Co.*, 912 F.2d 844, 848 (6th Cir. 1990), *overruled on other grounds* by *Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991)).  The Minnesota Supreme Court agreed, because it did "not believe that a school district will discriminate against its employees simply because it carries wrongful act insurance coverage . . . ." *Indep. Sch. Dist. No. 697 v. St. Paul Fire & Marine Ins. Co.*, 515 N.W.2d 576, 580 (Minn. 1994).

*Perl v. St. Paul Fire & Marine Insurance Co.*, 345 N.W.2d 209 (Minn. 1984), is also instructive.  An attorney and his law firm were found liable for breaching fiduciary duties owed to a former client and were ordered to return $20,000 in fees to the former client.  *Id.* at 211.  Both the attorney and the firm sought indemnification from their malpractice insurer.  *Id.*  After finding that the forfeiture of the client's fees was covered under the language of the malpractice policy, *Perl* addressed whether such a forfeiture was insurable under Minnesota law.  *Id.* at 211-14.  The court held that the forfeiture was uninsurable as to the attorney who committed the

misconduct, but insurable as to the firm, which was only vicariously liable for the misconduct. *Id*. at 215-17. Although premised on the "prime public policy concern" of policing attorney misbehavior, *id*. at 215, *Perl* can also be understood within the framework of moral hazard. An attorney will be more likely to engage in misconduct if the attorney can force his malpractice insurer to bear the cost of that misconduct.

With these principles in mind, the Court now turns to the question of whether Cook's claim for return of Oxford's $2.5 million investment in Mesa is insurable under Minnesota law. Arch argues that Cook's claim is uninsurable for two reasons:

*First*, Arch argues that Cook's claim for return of the $2.5 million is a claim for restitution, and that claims for restitution are always uninsurable under Minnesota law. But Arch cites no Minnesota case that holds that claims for restitution are always uninsurable. The one Minnesota case relied on by Arch — *Cargill, Inc. v. National Union Fire Insurance Co.*, No. A03-187, 2004 WL 51671 (Minn. Ct. App. Jan. 13, 2004) — is inapposite. Like Arch's policy, the insurance policy in *Cargill* insured against "loss." But unlike Arch's policy, the *Cargill* policy did not define "loss." Because "loss" was not defined, the *Cargill* court had to interpret the word — and, in interpreting the word, the *Cargill* court adopted a dictionary definition of "loss" as meaning "'financial detriment.'" *Id*. at *13 (quoting *Black's Law Dictionary* 956 (7th ed. 1999)). Applying that definition, the *Cargill* court found that an insured who was forced to pay restitution — that is, to return someone else's property — had not suffered a "financial detriment," and therefore had not suffered a "loss." *Id*. In short, *Cargill* was a policy-interpretation case; *Cargill* did not hold that claims for restitution are always uninsurable under Minnesota law.

As explained above, the Policy in this case — unlike the policy in *Cargill* — does define "Loss." In fact, the Policy defines "Loss" very broadly as "the amount that the Insureds are legally obligated to pay resulting from a Claim, including, without limitation, damages, settlements, judgments, pre- and post-judgment interest, Defense Costs, and Investigation Costs." D&O Policy Liability Coverage Part § 2.I. Without question, the $1 million judgment entered against Mesa is a "Loss" for purposes of the Policy. Because this Court need not interpret the word "Loss," and because *Cargill* says nothing about what is or is not insurable under Minnesota law, Arch's reliance on *Cargill* is misplaced.[9]

*Second*, Arch argues that intentional wrongdoing is always uninsurable under Minnesota law. Once again, however, Arch misreads the case law. The Minnesota Supreme Court has explicitly rejected "the proposition that public policy in Minnesota prohibits insurance coverage for any kind of intentional wrongdoing act." *Indep. Sch. Dist. No. 697*, 515 N.W.2d at 580. Moreover, many of the cases cited by Arch for the principle that intentional wrongdoing is always uninsurable are policy-interpretation cases — i.e., cases applying a provision in an insurance policy that explicitly excludes coverage for intentional wrongdoing. *See, e.g.*, *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885, 886 (Minn. 1978) (discussing an insurance policy that did not cover "bodily injury or property damage caused intentionally by or at the direction of the insured."). The Arch policy contains no such exclusion.

_____

[9]Arch also cites a number of out-of-jurisdiction cases for the principle that restitutionary damages are always uninsurable as a matter of law. Many of these cases, however, are similar to *Cargill*, in that they discuss only whether restitution is covered under the terms of a particular policy, and not whether restitution may be insured at all. *See St. Paul Fire & Marine Ins. Co. v. Village of Franklin Park*, 523 F.3d 754, 756-57 (7th Cir. 2008) (holding that restitution is not "loss" as the term is used in the policy); *CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, 505 F. Supp. 2d 1317, 1326 (M.D. Fla. 2007) (same).

For his part, Zayed argues that only certain kinds of intentional wrongdoing have been found to be uninsurable. Zayed points out that Cook brought claims for conversion, breach of fiduciary duties, and violations of the Minnesota Securities Act. Zayed argues that because these causes of action can arise from either intentional or unintentional wrongdoing, the Court cannot find that Cook's claim for the return of the $2.5 million is uninsurable as a matter of law.

But Zayed's interpretation exalts form over substance — which, as explained above, is the opposite of the approach that Minnesota courts have taken in deciding whether a claim is insurable. The Minnesota approach makes more sense than Zayed's, as any reasonably competent attorney can draft a complaint to camouflage a claim arising out of intentional wrongdoing.

Examining the substance (rather than the form) of Cook's claim for return of Oxford's $2.5 million investment in Mesa, it is abundantly clear that Cook was alleging that the defendants had engaged in intentional wrongdoing. Cook applied various labels to his claim, but, at bottom, his claim was that Baker knowingly lied to him to induce him to invest $2.5 million of Oxford's money into what Baker knew was a worthless company. Nothing in the complaint suggests negligence or carelessness on Baker's part. *See* Second Cook Compl. ¶ 32 ("Defendants' continued use of Cook's funds and failure to return Cook's funds upon his request represent an intentional conversion of Cook's property rights . . . ."); *id*. ¶ 41 ("At the time Baker made these false representations . . . he knew the representations were false and that he did not intend to return Cook's money to him. The statements were made with the intent to deceive or defraud Cook."); *id*. ¶ 45 ("Baker knew that these representations were false when made.").

Although the matter is not free from doubt, the Court finds it likely that the Minnesota Supreme Court would hold that Cook's claim against Mesa for return of Oxford's $2.5 million investment is uninsurable as a matter of Minnesota law.  As described above, the decisions of Minnesota courts on this topic have largely been driven by concern about moral hazard.  On the one hand, tax liability was held uninsurable in *Briggs* because such coverage would make insureds more likely to cheat on their taxes.  464 N.W.2d at 539.  On the other hand, liability for intentional discrimination was held insurable in *Independent School District No. 697* because such coverage would not make insureds more likely to engage in acts of discrimination.  515 N.W.2d at 580.

This case is closer to *Briggs* than to *Independent School District No. 697*.  Again, Cook claimed, in essence, that Baker was looking for money to prop up a failing company, and that Baker swindled Cook out of $2.5 million by misrepresenting the health of that company.  To allow someone in Baker's position to insure against such fraudulent conduct would undoubtedly lead to more such fraudulent conduct.  After all, if someone in Baker's position could foist the consequences of his behavior onto his insurer, he would have little incentive to be truthful in his dealings with potential investors.

In sum, the Court finds that Cook's claim for return of the $2.5 million that Oxford invested in Mesa is uninsurable as a matter of Minnesota law — and, because it is uninsurable as a matter of Minnesota law, it is excluded from the Policy's definition of "Loss."  Arch is not obligated to indemnify Mesa for the $1 million judgment entered pursuant to the *Miller-Shugart* settlement.

*C. Arch's Duty to Defend*

The Court has found that Arch is not obligated to indemnify either Mesa or Baker.  But that does not answer the question of whether Arch had a duty to defend Mesa or Baker in the underlying state-court action.  This is true for at least two reasons:

First, as a general matter, "[t]he duty to defend an insured . . . is broader than the duty to indemnify."  *Cargill, Inc. v. Ace Am. Ins. Co.*, 784 N.W.2d 341, 349 (Minn. 2010).  The duty to defend is broader than the duty to indemnify in three respects:  "(1) the duty to defend extends to every claim that arguably falls within the scope of coverage; (2) the duty to defend one claim creates a duty to defend all claims; and (3) the duty to defend exists regardless of the merits of the underlying claims."  *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006) (internal quotations omitted).

Second, under the Policy itself, Arch's duty to defend appears to be broader than its duty to indemnify.  The Policy obligates Arch to defend "each [covered] Claim . . . for which [Arch] receives notice . . . ."  D&O Policy General Provisions § 8.A.  The Policy defines "Claim" to include "any written demand for monetary or non-monetary relief . . . ."  D&O Policy Liability Coverage Part § 2.A.1.  Thus, Arch is obligated to defend certain demands for non-monetary relief.

But Arch's duty to indemnify extends only to "Loss" (in the case of Mesa, *see id*. §§ 1.B & 1.C) or "Non-Indemnifiable Loss" (in the case of Baker, *see id.* § 1.A).  The Policy excludes non-monetary relief from the definition of "Loss," *see id*. § 2.I.5, and the Policy's definition of "Non-Indemnifiable Loss" incorporates the definition of "Loss," *see* D&O Policy

General Provisions §§ 2.P & 2.R. Thus, Arch's duty to defend appears to extend to certain non-monetary claims, even though its duty to indemnify does not.

Cook's amended complaint — in addition to seeking return of the $2.5 million that Oxford invested in Mesa, and return of the $1.05 million that Oxford loaned to Mesa, and return of the $200,000 that Cook invested in the currency funds — also asserted a non-monetary claim. Specifically, Count Five of the amended complaint alleged that Baker had violated various duties toward Mesa's shareholders and wasted corporate assets, and Count Five asked that Mesa be involuntarily dissolved pursuant to Minn. Stat. § 302A.751. *See* Second Cook Compl. ¶¶ 50-61. This claim for dissolution of Mesa was "[a] written demand for . . . non-monetary relief," and thus it was a "Claim" for purposes of the Policy. D&O Policy Liability Coverage Part § 2.A.1. Arch therefore had an obligation to defend this claim if the claim was "covered" under the Policy. D&O Policy General Provisions § 8.A. And if Arch had a duty to defend this claim, then Arch had a duty to defend all of Cook's claims. *See Wooddale Builders*, 722 N.W.2d at 302.

The problem is that neither side briefed the question of whether Cook's non-monetary claim was covered under the Policy. Arch did argue that *none* of Cook's claims was covered — and thus that Arch had no duty to defend — on account of the "insured-capacity exclusion" in the Policy. That exclusion provides that Arch has no obligation to "pay Loss for any Claim against an Insured . . . arising from, based upon, or attributable to any Insured Person serving as a director, officer . . . or equivalent executive or as an employee of any entity other than an Insured Organization . . . ." D&O Policy Liability Coverage Part § 4.A.7. Cook's amended complaint alleged generally that "[a]t all relevant times, Baker was acting as an agent for Baker

Capital LLC and the Baker Currency Funds." Second Cook Compl. ¶ 7.[10] Arch argues that

since Baker was alleged to have acted "[a]t all relevant times" as an agent for Baker Capital and

the Baker Currency Funds, and since neither Baker Capital nor the Baker Currency Funds was an

insured organization under the Policy, none of the claims against Baker was covered.

Arch's argument suffers from at least a couple of flaws. First, the insured-capacity

exclusion provides that Arch "shall not *pay Loss* for any Claim against an insured" arising from

actions taken on behalf of a non-insured organization. D&O Policy Liability Coverage Part

§ 4.A.7 (emphasis added). Count Five of Cook's complaint, however, seeks non-monetary relief

(the dissolution of Mesa), which the Policy specifically excludes from the definition of "Loss."

Moreover, the question here is not whether Arch must "pay Loss" — that is, indemnify — but

whether Arch must defend. In short, the insured-capacity exclusion does not appear to excuse

Arch from defending Cook's non-monetary claim.

Second, and more importantly, although Cook's amended complaint alleged generally

that Baker was acting at all times on behalf of non-insured organizations, the amended complaint

also alleged that Baker, Baker Capital, the Baker Currency Funds, and Mesa were alter egos of

one another. *See* Second Cook Compl. ¶¶ 8-10. In other words, the amended complaint alleged

---

[10]The presence of this sentence in the amended complaint was undoubtedly an oversight. Recall that Cook's original complaint sought only the return of the $200,000 that he had invested in the currency funds managed by Baker Capital. It thus made sense for the original complaint to allege that "[a]t all relevant times, Baker was acting as an agent for Baker Capital LLC and the Baker Currency Funds." First Cook Compl. ¶ 8. The original complaint pertained only to Baker's acts on behalf of Baker Capital.

The original complaint was then amended to add claims regarding Oxford's $2.5 million investment in Mesa and Oxford's $1.05 million loan to Mesa. Obviously, the allegation regarding Baker's capacity should have been expanded to reflect the fact that Cook was now challenging not only Baker's actions on behalf of Baker Capital, but also Baker's actions on behalf of Mesa. Cook's attorneys apparently failed to notice the discrepancy.

that Baker was acting at all times on behalf of *both* an insured organization (Mesa) *and* a non-insured organization (e.g., Baker Capital).

Arch argues that all of Cook's claims nevertheless fell within the insured-capacity exclusion, because that exclusion precludes coverage for any act that is committed by an "Insured Person" while acting in a dual capacity — that is, while acting simultaneously on behalf of an insured organization and a non-insured organization. Putting aside the fact that Arch's interpretation of the insured-capacity exclusion is not clearly mandated by the language of that exclusion, there can be little doubt that, with respect to Cook's non-monetary claim, Baker was being sued for acts taken solely in his capacity as a director of Mesa. Again, the non-monetary claim (Count Five of the amended complaint) was brought under § 302A.751, subd. 1(b), which authorizes a shareholder of a corporation to seek involuntary dissolution of that corporation when a director of that corporation has breached duties to that corporation's shareholders or wasted that corporation's assets. It would be senseless to say that an act that Baker took on behalf of, say, Baker Capital gave rise to a claim to dissolve *Mesa* under § 302A.751. On any reasonable reading, then, the non-monetary claim in the amended complaint pertains to acts committed by Baker solely in his capacity as a director of Mesa.

Returning to the question of whether Arch breached its duty to defend Mesa and Baker: The Court has held that the claims asserted in Counts One, Two, Three, and Four of the amended complaint — that is, the claims that sought the return of the $2.5 million that Oxford invested in Mesa, the $1.05 million that Oxford loaned to Mesa, and the $200,000 that Cook invested in the currency funds — were not covered by the Policy. But if the non-monetary claim asserted in Count Five of the amended complaint was covered, then Arch had a duty to defend all of the

claims.  Unfortunately, though, the parties said almost nothing about Count Five in their briefs — save for Arch's now-rejected insured-capacity argument — and thus the Court is simply not in a position to rule on whether Arch breached its duty to defend.  For that reason, both parties' motions for summary judgment are denied without prejudice insofar as they pertain to Arch's duty to defend.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      The motion for summary judgment of defendant Arch Insurance Company [ECF No. 32] is GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART.

    a.      Arch's motion is GRANTED insofar as Arch seeks a determination that it is not required to indemnify Mesa and Baker for liability incurred in connection with the underlying state-court action.

    b.      Arch's motion is DENIED WITHOUT PREJUDICE insofar as Arch seeks a determination that it did not violate its duty to defend Mesa and Baker in the underlying state-court action.

2.      The motion for summary judgment of plaintiff R.J. Zayed, in his capacity as court-appointed receiver for Trevor G. Cook, et al. [ECF No. 37], is DENIED WITH PREJUDICE IN PART and DENIED WITHOUT PREJUDICE IN PART.

a.       Zayed's motion is DENIED WITH PREJUDICE insofar as Zayed seeks a

determination that Arch is required to indemnify Mesa and Baker for

liability incurred in connection with the underlying state-court action.

b.       Zayed's motion is DENIED WITHOUT PREJUDICE insofar as Zayed

seeks a determination that Arch violated its duty to defend Mesa and

Baker in the underlying state-court action.


Dated: March 20, 2013                         s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge